UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **TOBY MARTIN, JR.** | \* | **CIVIL ACTION NO.: 16-14717** |
| versus | | |
| | | **SECTION: "G"** |
| | \* | **Judge Nannette Jolivette Brown** |
| **L & M BOTRUC RENTAL, LLC AND** | \* | **MAG. 2** |
| **HERCULES OFFSHORE SERVICES, LLC** | | **Judge Joseph C. Wilkinson, Jr.** |

**MEMORANDUM IN OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT AND/OR MOTION TO COMPEL CURE, AND IN THE ALTERNATIVE, MOTION FOR EXPEDITED TRIAL ON THE ISSUE OF CURE**

MAY IT PLEASE THE COURT:

Defendant L & M BoTruc Rental, LLC ("L&M") opposes the Motion for Partial Summary Judgment filed on behalf of Plaintiff Toby Martin, Jr. ("Plaintiff") on the grounds there genuine issues of material facts in dispute, including issues of whether the alleged unwitnessed accident occurred, whether Plaintiff injured his thoracic spine while working for L&M, whether thoracic spine fusion surgery from T7-T10 is medically necessary and related to working at L&M or pre-existing conditions, and/or whether thoracic spine fusion surgery is palliative care, and L&M is not as matter of law liable for maintenance and cure for the thoracic spine fusion surgery from T7-T10.  Since Martin cannot satisfy the threshold issue that he is entitled to "cure" for the thoracic surgery, Plaintiff is not entitled to punitive damages.  Nonetheless, it is undisputed that L&M has paid all maintenance and cure due to Martin since August 19, 2016 due to his low back complaints.

**FACTS.**

Plaintiff was employed by L&M as a seaman. Plaintiff claims that on December 25, 2015 an unwitnessed accident occurred on the back deck of C Truc 8.  L&M denies Plaintiff was an accident occurred in which Plaintiff was hit by a crane hook.

At the time of the alleged incident, C Truc 8 was tied to the rig with a safety or blue line completing an operation of pumping mud to the rig.  According to Plaintiff, he untied the safety line from the bit of the vessel, then he walked to the center of back deck and was hit by the crane hook.  Then, Plaintiff continued to work.  Plaintiff helped closed the mud valves and the mud lines were taken up from the vessel by the crane hook.  More specifically, Plaintiff claims he untied the line from the aft stern bite, then he walked around the headache bar and walked 7-12 feet to the center of the deck and he held a figure 8 cable in his right hand that was attached to the blue tag line (the blue tag line was attached to the line).  Plaintiff was facing the port or out-side of the vessel when he claims he was hit in the back by the crane hook.  Plaintiff did not see the crane hook before it hit him.  Plaintiff claims the crane hook hit him in the "lower back".  Plaintiff fell to his knees.  While on his knees, he grabbed the crane hook thee crane hook that was swinging on his right-side and attached the figure 8 cable.  Plaintiff had a VHS radio attached to the right top side of his safety vest, but he did not tell the crane operator he had been hit.  Plaintiff did not know where the other crew members were at the time of the incident. Plaintiff continued to work his shift.  Plaintiff helped Marlon Oliva close the mud valves, and then the crane hook took the mud hose up.  A man came down to the vessel in a personnel basket and Plaintiff held the tag line attached to the basket.   After his shift ended, Plaintiff took a shower and laid in his bunk, then reported the incident to the Mate Daniel Hubble. See deposition of Plaintiff Toby Martin, Jr. taken on 5/18/17 pages 20 to 38 line 17, page 45 line14 to page 48 line 2 and Vessel Diagram (attached to deposition as Exhibit 8) attached hereto and marked *in globo* as **Exhibit 1.**  The next day Plaintiff told the L&M Safety Manager Jay Ougel how the alleged accident happened, and Jay Ougel drew a diagram as Plaintiff stood next to Ougel.  Plaintiff told Ougel the hook was swinging 15 ft. back and forth going from port to starboard, while Plaintiff was standing in the middle of the

2

back deck. See deposition of Ougel page 148 line 13 to page 153 line 15 and Vessel Diagram (attached to deposition as Exhibit 9) and attached hereto and marked *in globo* as **Exhibit 2.**

Marlon Oliva, the other AB who on deck with Plaintiff, directly contradicts Plaintiff version of events. Oliva testified that Oliva hooked the safety line to the crane hook and untied the line from the bite, not Plaintiff. More specifically, Oliva testified after they were finished pumping, the hook came down and Oliva hooked the slack end on the blue (safety) line to the hook. As the crane operator pulled up the slack, Oliva untied the line from the bit. Plaintiff was behind Oliva. See deposition of Oliva taken 6/6/17 page 19 line 18 to page 20 line 16 and page 27 line 15 to page 31 line 6 and (vessel diagram attached to deposition as Exhibit 2) and attached hereto and marked *in globo* as **Exhibit** 3**.** Oliva did not see Plaintiff get hit by the crane hook. But, more importantly, if Oliva hooked the safety line to the crane hook and then untie the line, it is impossible for the crane hook have hit Plaintiff.

The Mate Daniel Hubble was at the helm of C Truc 8. Hubble did not see Plaintiff get hit by the crane hook. Deposition of Hubble taken page 101 -104 and written statement of Hubble (attached to deposition as Exhibit 10) attached hereto and marked *in globo* as **Exhibit 4.** It is undisputed that Hubble had a clear view of the back deck where Plaintiff claims the accident occurred.

The crane operator Lincoln Celestine had no knowledge of this alleged accident, he was never advised there was an injury and he had no recollection of the events on the date of the alleged accident. See deposition of Celestine taken on 7/31/17 page 30 line 16 to page 32 line 25 attached hereto and marked as **Exhibit 5.**

On December 26, 2015, Martin was examined by physician's assistant Vernon Foret at Dr. Blanchard's office. There was no swelling, no abrasions and no bruises. X-rays of the lumbar

3

were normal. Plaintiff had some pain in the low back and maybe as high as T12. Plaintiff has no objection findings, no abrasions, swelling redness or anything like that. See deposition of Dr. Blanchard taken on 2/27/18 page 59 to page 63 lines 12 and pain diagram (attached to deposition as Exhibit 3) attached hereto and marked *in globo* as **Exhibit 6.** Plaintiff was not given any prescription medication, Plaintiff was released to return to work, and that was the only medical treatment he sought until August, 2016 See deposition of Martin page 102 line 25 to page 103 line 13 attached hereto and marked as **Exhibit 7.**

Martin returned to work for L&M for his next scheduled hitch (January 17, 2016), working 14 days of and 14 days off. See deposition of Martin page 51 line 2 to line 6 attached hereto and marked as **Exhibit 8** and Employment Payroll Records attached to L&M's discovery responses attached hereto and marked as **Exhibit 9.**

On March 1, 2016, Martin voluntarily quit his job with L&M for more money to work as a deck hand at Central Gulf Towing, LLC. See Employment Personnel Action Form attached to L&M's discovery responses and deposition of Martin (deposition Exhibit 10) attached hereto and marked as **Exhibit 10** and deposition of Martin page 52 line 1 to line 15 attached hereto and marked as **Exhibit 11**. On 3/1/16, Martin passed a physical for Central Gulf performed by Dr. Blanchard. Dr. Blanchard performed a physical exam including range of motion, evaluation of the spine and put pressure on the spine and everything was normal. There were no objective findings, no tenderness, and no subjective complaints. See deposition of Dr. Blanchard page 70 to page 73 attached hereto and marked as **Exhibit 12.** Martin filled in a medical questionnaire and indicated he never received a disability rating from any injury to any part of his body, never been limited in any amount of weight he could lift, never failed a physical, he was not taking prescription medication. See deposition of Dr. Blanchard pages 82 line 18 to page 83 line 10 attached hereto

4

and marked as **Exhibit 13**. On the physical, Dr. Blanchard specifically found no tenderness when tracing his fingers along the spine. See deposition of Dr. Blanchard page 83 line 25 to page 84 line 9 attached hereto and marked as **Exhibit 14**. Lumbar X-rays, including T12, were take on 3/1/16 and were normal. See deposition of Dr. Blanchard page 74 to page 75 attached hereto and marked as **Exhibit 15**. On 3/1/16, Dr. Blanchard passed Martin on his physical.

In connection with his employment at Central Gulf, Plaintiff completed an application for health insurance dated May 27, 2016 and Plaintiff verified that he did not have any back pain. Martin signed the certification that the information was true and correct. See Blue Cross health insurance form from the Central Gulf employment records (attached to Plaintiff's Rule 26 Initial Disclosures and Central Gulf SDT response) attached hereto and marked as **Exhibit 16.** While working at Central Gulf, on 7/28/16, Plaintiff injured his ankle and was seen at Occupational Medicine Services. See Central Gulf employment records, **Exhibit 16.**

On referral by his attorney, Plaintiff went to Integrated Spine and Disc on August 19, 2016. Dr. Raul Reyes performed the initial examination and recorded Plaintiff complained of lumbar pain; Plaintiff did not complain of thoracic pain. See the M.D. Report: Initial Report, produced in the Certified Medical Records from Integrated Spine and Disc attached hereto and marked *in globo* as **Exhibit 17.** On August 19, 2016, Paul Gordon, D. C. also did an initial chiropractic examination for low back pain only; Plaintiff did not complain of thoracic pain. See the Initial Examination Report: Chiropractic, produced in the Certified Medical Records from Integrated Spine and Disc attached hereto and marked *in globo* as **Exhibit 17.** X-rays of the lumbar were done on 8/19/18; no X-rays of the thoracic spine were done. Plaintiff did not complain of thoracic pain. See the Radiographic Report produced in the Certified Medical Records from Integrated Spine and Disc attached hereto and marked *in globo* as **Exhibit 17.** A referral for TENS Unit was given for a

home TENS unit for the Lumbar, not the Thoracic region. See the TENS Unit Referral produced in the Certified Medical Records from Integrated Spine and Disc attached hereto and marked *in globo* as **Exhibit 17.** Plaintiff was referred for a lumbar MRI; Plaintiff was not referred for a Thoracic MRI. See the Diagnostic Testing Referral produced in the Certified Medical Records from Integrated Spine and Disc attached hereto and marked *in globo* as **Exhibit 17.** Martin received therapy on his low back on 8/19/16, 8//22/16, 8/24/16, 8/29/16 and 9/13/16, and Daily Treatment Record indicate Plaintiff never complained of the thoracic spine or mid-back pain or stiffness and Plaintiff did not receive any treatment for the mid-back or thoracic spine. See Daily Treatment Records produced in the Certified Medical Records from Integrated Spine and Disc attached hereto and marked *in globo* as **Exhibit 17.** On 9/13/16, Martin was re-examined at Integrated Spine and Disc, and again, there is no record of thoracic pain. See Final Examination Report: Chiropractic in the Certified Medical Records from Integrated Spine and Disc attached hereto and marked as **Exhibit 17.**

The lawsuit filed on September 15, 2016 was L&M's first notice of Plaintiff's claim for maintenance and cure. See Record Document 1. L&M filed an Answered the Complaint on November 3, 2016 (see Record Document 13) and denied the alleged unwitnessed accident took place and commenced discovery. See Record Document 13.[1] In December, 2016, L&M

---

[1] On December 20, 2016, L&M sent Plaintiff Interrogatories and Request for Production of Documents. On January 12, 2017, undersigned counsel sent a request to Plaintiff's counsel for an independent medical exam with Dr. Najeeb Thomas. See letter dated January 12, 2017; attached and marked as Exhibit 8 to Opposition to Motion to Continue, Trial Record Document 37. On February 7, 2017, undersigned counsel had a discovery conference with counsel for Plaintiff's office to get Answers to Interrogatories, Responses to Request for Production of Documents, and schedule the deposition of Plaintiff. Undersigned counsel agreed to an extension of time for Plaintiff to provide discovery responses by the next week. See email dated February 7, 2017; attached and marked as Exhibit 8 to Record Document 37. The deposition of Plaintiff was set for March 7, 2017, a date mutually agreed upon by counsel for Plaintiff's office. See Notice of Deposition; attached and marked as Exhibit 9 to Record Document 37. After receipt of the Notice of Deposition, counsel for Plaintiff unilaterally cancelled the scheduled deposition. See email dated February 7, 2017; attached and marked as Exhibit 10 to Record Document 37. Counsel for Plaintiff did produce signed medical authorizations on February 7, 2017, and undersigned counsel sent requests via fax for certified medical records to numerous medical providers including Louisiana Heart Medical Group/The North Institute (Dr. Dietze's office), Integrated Spine & Disc, Stand-Up Open MRI, Dr. Blanchard and Imaging Center of South Louisiana. See letters to

204/124.0726

commenced paying maintenance and cure for the lower back complaints.[2]   On May 9, 2017, undersigned counsel scheduled and advised Plaintiff an independent medical examination with Dr. Najeeb Thomas at his office set for 10/02/17.   Plaintiff arrived late for the exam, so Dr. Thomas refused to examine Plaintiff.  This case was originally set for trial on August 6, 2018, and Dr. Thomas's next available date for an IME was after the trial date. Plaintiff's failure to timely arrive for the exam caused Defendant to have to have to request another independent medical examiner, Dr. Awashti.[3]   The initial trial date was continued on Motion to Continue Trial filed by Plaintiff because on June 16, 2017 Dr. Dietze recommended lumbar surgery.[4]   The trial was reset to 8/6/18.  Dr. Dietze's deposition was taken on April 13, 2018, and Dr. Dietz testified he did not recommend

---

providers dated February 9, 2017; attached and marked *in globo* as Exhibit 11 to Record Document 37. On February 22, 2017, undersigned counsel received Plaintiff's discovery responses.  In the discovery responses, Plaintiff disclosed other medical treatment and injuries that necessitated the undersigned counsel sending additional requests for medical records, including records from Terrebonne General Medical Center, Occupational Medicine Services, LLC in Houma, Dr. Haydel and Lady of the Sea.  See letters to providers dated March 13, 2017; attached and marked *in globo* as Exhibit 12 to Record Document 37.

[2] Plaintiff requested approval of a lumbar CT scan that was requested in error (See deposition of Dr. Dietz Record Document 115-4 page 50) and undersigned counsel had to set another discovery conference for April 24, 2017, to obtain the deposition of Plaintiff.   In response to Plaintiff's requested approval of a lumbar CT scan, on March 14, 2017, the undersigned counsel requested Plaintiff to provide an explanation as to why the progress note by Lorenzo Fisher, FNP-C (Dr. Dietze's assistant) recommended a CT scan of the lumbar spine as "Per radiologist recommendations", when there was no radiologist report recommending a CT scan of the L-S spine, rather the radiologist recommended a CT of the thoracic spine and L&M authorized same.  See email dated March 14, 2017; attached and marked as Exhibit 13 to Record Document 37. Counsel for Plaintiff scheduled and paid for the CT of the lumbar spine performed on March 8, 2017, and requested reimbursement for L&M, and L&M reimbursed counsel for the Plaintiff.  Plaintiff never provided a reason why the progress note by Lorenzo Fisher, FNP-C recommended a CT scan of the lumbar spine as "Per radiologist recommendations", but did send to undersigned counsel an Order for a CT scan of the thoracic spine on March 28, 2017.  See email dated March 28, 2017; attached and marked as Exhibit 14 to Record Document 37. Undersigned counsel contacted Diagnostic Imaging Service ("DIS") in Metairie but did not get a response, so L&M offered to schedule the CT scan at Physician's Surgical Center in Houma or Lady of the Sea in Cutoff, Louisiana, which is closer where Plaintiff lives in Galliano, Louisiana, than Metairie.   On April 13, 2017, undersigned counsel spoke with DIS and DIS required pre-payment which was sent.  See emails dated April 12, 2017 and April 13, 2017; attached and marked as Exhibit 15 Record Document 37.  L&M sent pre-payment of $450.  The DIS charge was only $425 so undersigned counsel authorized DIS to accept payment and scheduled the CT scan but counsel for Plaintiff's office spoke to DIS and paid the $425 and L&M agreed to reimburse counsel for Plaintiff. See email dated April 21, 2017; attached and marked as Exhibit 16 to Record Document 37.

See email dated April 21, 2017 attached and marked as Exhibit 17 to Record Document 37.   On May 2, 2017, undersigned counsel again responded to counsel for Plaintiff indicating L&M was not denying M&C, confirming L&M had not been asked to arrange for appointments other than the thoracic CT scan and offering to reimburse the treatment recommended by Dr. Dietze.  See emails dated May 2, 2017 attached and marked as Exhibit 18 to Record Document 37.

[3] Defendants had file a Motion to Extend Defendant's expert Deadlines, Record Document 46.

[4] See Motion to Continue Trial, Record Document 32.

thoracic surgery. See depositions testimony of Dr. Dietz Record Document 115-4 and cited below. Plaintiff filed a second Motion to Continue Trial because on Plaintiff wanted to undergo thoracic surgery.[5]

Plaintiff was referred by his attorney to Dr. Donald Dietze. See deposition testimony of Toby Martin page 59 lines 1-2 attached hereto and marked as **Exhibit 18.** Dr. Dietze saw Plaintiff on 11/3/16, almost 1 year after the alleged incident, and for the first time complained of thoracic pain. See Dr. Dietze Progress Note dated 11/3/16 Record Document 115-2 pages 102-104. Dr. Dietze testified in his deposition taken on 4/13/18 that Dr. Dietze treated the thoracic spine as a separate condition from the lumbar. See Dr. Dietze deposition Record Document 115-4 page 21 lines 18-22. Dr. Dietze ordered a thoracic MRI performed in 2016 that showed anterior wedge from T7-T10 and Dr. Dietze testified the MRI showed a congenital condition called Scheuermann's kyphosis or Scheuermann's disease in which both the superior and inferior aspect of the vertebral bodies can change slope and because the anterior aspect gets shallower or shorter, it creates more of a bend and that thoracic kyphosis increased, it's an exaggerated normal curvature. See Dr. Dietze deposition Record Document 115-4 page 25 line 12 to page 26 line 18. A thoracic CT scan dated 4/27/17 showed what the radiologist called a posterior margin osteophyte in which Dr. Dietze testified was consistent with the wedging of the vertebral bodies that was pre-existing. See Dr. Dietze deposition Record Document 115-4 page 27 line 3 to page 28 line 23. Dr. Dietze did not order a thoracic CT myelogram as suggested by the radiologist because Dr. Dietze there was no spinal cord compression on the MRI or on exam there was no myelopathy. Dr. Dietze deposition Record Document 115-4 page 28 line 24 to page 30 line 4. Dr. Dietze testified Plaintiff would not require thoracic spine surgery for any alleged injuries he may have

---

[5] See Motion to Continue Trial, Record Document 94.

sustained in the subject incident, and if he did require thoracic surgery, it would be for the Scheuermann's kyphosis and it would have to progress:

> Q: And other than the injections with the facet block or rhizotomy, you're not recommending any type of thoracic spine surgery?
>
> A: No, I'm not. If he did require surgery, it would be honestly for the Scheuermann's kyphosis and it would have to progress. And that I would not associate to this injury. I think he'll need management, pain management, but not spinal surgery.
>
> Deposition Dr. Donald Dietze Record Document 115-4 page 30 lines 5-14**.**

Dr. Dietze testified that Plaintiff was at MMI for his thoracic pain:

> Well, let's stick with the thoracic. **I'm not going to do surgery on the thoracic**. He still has thoracic pain. **That's at MMI.** That's what it is. It's not predicted to get worse because of the injury and unfortunately at this time it's not predicted to get better. (emphasis added).
>
> Deposition Dr. Donald Dietze Record Document 115-4 page 31 lines 12-18.

In his deposition, Dr. Dietze discussed his recommendations for injections, and a possible rhizotomy. See Deposition of Dr. Dietze Record Document 115-4 page 60 line 5 to page 65 line 5. Dr. Dietze specifically testified that if Plaintiff did not get relief from the pain management, then Dr. Dietze still would not recommend thoracic surgery. Specifically, Dr. Dietze testified:

```
15  And I would say --  And I'm sure
16  some of my colleagues consider me aggressive
17  surgically, but I think even colleagues that
18  are even more aggressive surgically, and they
19  would consider, not inappropriately, if
20  Scheuermann's kyphosis can be treated with a
21  fusion and if he had persistent pain, an
22  argument could be made to fuse his thoracic
23  spine.
24  Again, I personally don't
25  recommend that for a 22 year-old gentleman.
                    Page 65
 1  But for my personal strategy, if
 2  the injections don't work, then it's going to
 3  be pain management through oral medications,
```

9

> 4  holistic treatment, massage, you know, stuff
> 5  like that.  (emphasis added).

Deposition of Dr. Dietze Record Document 115-4 deposition page 64 line 15 to page 65 line 5.

There has been no change in Scheuermann's kyphosis since Dr. Dietze's deposition. An advanced Thoracic MRI was performed on 9/21/18 that showed no significant spinal canal stenosis. See Thoracic MRI report marked as **Exhibit 19** and Dr. Dietze's Progress Note dated 10/3/18 Record Document 115-4 page 4 to page 6. There has been essentially no change in Plaintiff's thoracic spine since Dr. Dietze's deposition to justify thoracic surgery related to the alleged injury. The only change since Dr. Dietz's deposition was Plaintiff Martin got transient pain relief from injections and "He feels something needs to be done." Dr. Dietze's Progress Note dated 05/16/18 Record Document 115-4 page 24. And, Dr. Dietze testified on 4/13/18 that Plaintiff was at maximum medical improvement ("M.M.I.") for his thoracic pain (Record Document 115-4 deposition page 31 lines 12-18) and Plaintiff would be M.M.I. for his lumbar a year after the lumbar surgery, which was 10/24/17 (Record Document 115-4 deposition page 5 and page 18 line 24 to page19 line 10).

On 10/8/18, Dr. Dietze referred Plaintiff to Dr. Crapanzano for pain management for chronic back syndrome. Dr. Dietze's Progress Note dated 10/3/18 Record Document 115-4 page 4 to page 6. Even though Dr. Dietz has testified Plaintiff is M.M.I., L&M has approved an evaluation by Dr. Crapanzano under protest.

Dr. Awashti performed Independent Medical Examinations on Toby Martin on July 6, 2017 and July 2, 2018, and Dr. Awashti has reviewed the records and imaging. See Dr. Awashti's Affidavit attached hereto and marked at **Exhibit 20** reports

  1.  Report dated July 6, 2017 (marked as Document 115-3, p. 46-50)
  2.  Report dated July 24, 2017 Addendum to IME, July 6, 2017

204/124.0726

     (marked as Document 115-3, p. 52)
  3. Report dated April 30, 2018 Second Addendum to IME, July 6, 2017
     (marked as Document 115-3, p. 54-56)
  4. Report dated July 2, 2018, Second IME
     (marked as Document 115-3, p. 42-43)
  5. Report dated October 1, 2018, Addendum to IME, July 2, 2018
     (attached hereto as Exhibit "B")
  6. Report dated October 29, 2018, (attached hereto as Exhibit "B")

After the initial examination on 7/6/17 and review of the imaging, Dr. Awashti opined Plaintiff did not have an injury to the thoracic spine. See Dr. Awashti Report dated July 6, 2017 Record Document 115-3, p. 46-50. Dr. Awashti reviewed the 2/18/ 2018 thoracic MRI and did not see any major abnormalities or thoracic disc herniations or thoracic stenosis. Dr. Awashti's opinions regarding the thoracic spine did not change. See Dr. Awashti Report dated April 30, 2018 Second Addendum to IME, July 6, 2017 Record Document 115-3, p. 54-56. After the second examination on 7/2/18, Plaintiff's exam showed no focal neurological deficits. Dr. Awashti opinion was unchanged, he did not feel thoracic spine surgery was indicated. Dr. Awashti did not see any pathology. Dr. Awashti Report dated July 2, 2018, Second IME, Record Document 115-3, p. 42-43. Dr. Awashti reviewed the 4/27/17 Thoracic CT scan and found it does not reveal any significant abnormalities. There are no fractures and no malalignment. There is no obvious spinal cord compression. There are no obvious disc herniations. Dr. Awashti agreed with the radiologist report that there was only mild spondolytic changes along the thoracic spine. None of these findings warrant any surgical intervention of the thoracic spine. See Dr. Awashti Report dated October 1, 2018, Addendum to IME, July 2, 2018 See **Exhibit 20.** After a review of the 9/21/18 Thoracic MRI, Dr. Awashti opined there was no significant spinal cord compression and he did not recommend any type of thoracic surgical intervention. Dr. Awashti certainly would not recommend a fusion of the thoracic spine since the disc degeneration to be very significant and there was no significant disc dehydration. See **Exhibit 20.**

11

## LAW AND ANALYSIS

**Standard on a Motion for Summary Judgment**

Summary judgment is appropriate when the pleadings, discovery, and any affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[6] All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment."[7] If the record, as a whole, could not lead a rational trier of fact to find for the non-moving party, then no genuine issue of fact exists and the moving party is entitled to judgment as a matter of law.[8]

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden merely by pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim.[9] The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue of fact exists.[10] The nonmoving party must identify specific facts in the record and articulate the precise manner in which that evidence establishes a genuine issue for trial.[11]

---

[6] Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

[7] *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985); Little, 37 F.3d at 1075.

[8] *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

[9] *See Celotex*, 477 U.S. at 325.

[10] *See id.* at 324.

[11] *See, e.g.*, *id.* at 325; *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998); *Little*, 37 F.3d at 1075; *Isquith ex rel. Isquith v. Middle South Utils., Inc.*, 847 F.2d 186, 198 (5th Cir. 1988), cert. denied, 488 U.S. 926, 109 S. Ct. 310, 102 L. Ed. 2d 329 (1988).

204/124.0726

In order to recover for a claim of maintenance and cure and attorney's fees, the Plaintiff bears the burden of proving that he was injured in the course of his employment aboard the vessel, that his employer failed to pay his maintenance and cure and that this failure was not only unreasonable, but was also callous and recalcitrant, arbitrary and capricious, or willful, callous, and persistent.[12] "Before Plaintiff can recover maintenance and cure, he bears the burden of alleging and proving the following facts: (a) his engagement as a seaman, (b) that his illness or injury occurred, was aggravated or manifested itself while in the ship's service, (c) the wages to which he may be entitled, and (d) the expenditures or liability incurred by him for medicines, nursing care, board and lodging." [13]

**Maintenance and Cure.**

Maintenance and cure is an old remedy under general maritime law that is implicit in the contractual relationship between the seaman and his employer and designed to assist in the recovery of a seaman upon injury or illness sustained while in the service of the ship.[14] Cure is the employer's obligation to pay for medical expenses for sick or injured seaman which are incurred by the seaman as a result of injury or illness incurred while in the service of the ship.[15]

When there are conflicting diagnoses and prognoses from various physicians, there is a question of fact to be determined by the trier of fact as to a Plaintiff's entitlement to maintenance and cure benefits and as to whether an employer's termination of maintenance and cure benefits

---

[12] *Kendrick v. Maersk Line, Ltd.*, 2006 U.S. Dist. LEXIS 65741, *11-12, 2006 WL 2662996 (E.D. La. 2006).

[13] *Gorum v. Ensco Offshore Co.*, 2002 U.S. Dist. LEXIS 21992, *14-15 (E.D. La. 2002).

[14] *Pelotto v. L & N Towing Co.*, 604 F.2d 396, 400 (5th Cir. 1979).

[15] *Vella v. Ford Motor Co.,* 421 U.S. 1, 95 S.Ct. 1381 (1975); *Springborn v. Amer. Comm. Barge Lines, Inc.,* 767 F.2d 89 (5th Cir. 1985).

204/124.0726

was arbitrary or capricious. [16] In *Chaney,* Judge Kurt Engelhardt denied Plaintiff's Motion for Summary Judgment because even though the defendant admitted an incident occurred, but contested Plaintiff was injured. Judge Engelhardt stated "Here, there clearly is a difference of opinion between the company doctors and those chosen for Chaney by his attorneys. This is a factual dispute appropriately reserved for the trier of fact. . . Therefore, because genuine issue of material fact exist concerning Chaney's entitlement to continued maintenance and cure, summary judgment is not appropriate.[17]

In this case, like in *Chaney,* after Dr. Dietz apparently changed his opinion that he did not recommend thoracic surgery, there is a clearly a difference of opinion between Dr. Awashti and Dr. Dietz. Dr. Awashti the thoracic MRI dated 12/15/16 and found it was essentially normal with mild degenerative disc bulges at multiple levels but no evidence of any spinal cord or neural compression and Plaintiff did not injure his thoracic spine. See Dr. Awashti's Report dated July 6, 2017 Document 115-3, p. 46-50. Dr. Awashti's opinion has essentially remained unchanged

The right to cure terminates only when maximum cure has been obtained. Maximum cure is achieved when it is probable that further treatment will result in no betterment of the seaman's condition. It is proper to declare maximum cure if the condition is incurable or if further treatment will only relieve pain and suffering.[18] The law is clear that the obligation to provide maintenance and cure is not an open-ended duty, but rather expires at the point of maximum cure. The shipowner's obligation lasts until such time as the seaman reaches maximum medical

---

[16] *Chaney v. Omega Protein, Inc.,* 2010 WL 09-7235 (E.D.La. July 21, 2010) page 4 citing *Estelle v. berry Bros. General Contractors, Inc.,* 2008 WL 718138 (E.D.La. Mar.14, 2008) (citing *Lodrigue v. Delta Towing, L.L.C.,* 2003 WL 22999425, *6 (E.D.La. Dec. 19, 2003; *Tullos v. Resource Drilling, Inc.,* 750 F.2d 380 (5th Cir.1985).
[17] *Chaney*, id.
[18] *Domingue v. Offshore Service Vessels, LLC*, 2010 WL 08-4668, (E.D. La. March 11, 2010), page 2 citing *Bertram v. Freeport McMoran, Inc.,* 35 F.3d 1008, 1012 (5th Cir.1994) (internal quotation and citation omitted) *Springborn v. American Commercial Barge Lines, Inc.,* 767 F.2d 89, 95 (5th Cir.1985) and *Pelotto v. L & N Towing Co.,* 604 F.2d 396, 404 (5th Cir.1979).

14

improvement. 'Maximum medical cure' is reached when the seaman recovers from the injury, the condition permanently stabilizes or cannot be improved further. If the seaman thereafter needs attention to maintain his improvement at the maximum, to assist him in recovery from relapses, or to restrain the progress of the disease, the shipowner is not bound to provide that. The accepted legal standard holds that maximum cure is achieved when it appears probable that further treatment will result in no betterment of the seaman's condition. Distinguishing between treatment that actually improves the medical condition, which is covered by maintenance and cure, and simply palliative care, which is not, but allowing that the boundary separating those categories is often "fuzzy". Thus, if further treatment would merely relieve pain and suffering but not improve the seaman's underlying physical condition, the point of maximum cure has been reached. [19]

In *Baucom*, Plaintiff sued defendants for separate accidents in 2003 and 2005 seeking maintenance and cure for a recommended back surgery. The court appreciated that Plaintiff needed back surgery, but the court denied the Motion for Summary Judgement because it was the record was rife with genuine questions of material fact. There were issues as to whether Plaintiff reached maximum cure, whether the contemplated treatment related to the 2003 or 2005 accidents, whether the surgery is required to ameliorate a long-standing, pre-existing condition of degenerative disc disease in the spine, not related to either accident, and whether the contemplated treatment is mere palliative care outside the realm of any maintenance and cure duty the employer might have.[20]

---

[19] *Baucom v. Sisco Stevedoring, LLC*, 506 F.Supp.2d 1064 (2007), pages 1074-1075, citing *Belcher Towing Co. v. Howard,* 638 F.Supp. 242, 243 (S.D.Fla.1986); *see also Norfolk Dredging Co. v. Wiley,* 450 F.Supp.2d 620, 622 (E.D.Va.2006), *McMillan v. Tug Jane A. Bouchard,* 885 F.Supp. 452, 459 (E.D.N.Y.1995), *Pelotto v. L & N Towing Co.,* 604 F.2d 396, 400 (5th Cir.1979), *Saco v. Tug Tucana Corp.,* 483 F.Supp.2d 88, 99 (D.Mass.2007), and *In re RJF Int'l Corp. for Exoneration from or Limitation of Liability,* 354 F.3d 104, 106 n. 1 (1st Cir.2004)

[20] *Baucom, id.,* and footnote 20 which states in part: *See, e.g., Pelotto,* 604 F.2d at 400 (treatment that will merely relieve pain and suffering without otherwise improving seaman's physical condition is not compensable under maintenance and cure framework). . . *See Matter of Cooper/T. Smith Stevedoring Co.,* 942 F.Supp. 267, 269

15

In the case at bar, the Motion for Summary Judgment should be denied because there are genuine questions of material fact, including issues as to whether Plaintiff reached maximum cure, whether the contemplated the thoracic surgery is related to the alleged unwitnessed accident on 12/25/15, whether the surgery is required to ameliorate a long-standing, pre-existing condition, and whether the contemplated treatment is mere palliative care outside the realm of maintenance and cure. According to Dr. Dietz's deposition testimony, Plaintiff was M.M.I. for the thoracic spine, (Deposition Dr. Donald Dietz Record Document 115-4 page 31 lines 12-18), thoracic surgery is related to the pre-exiting condition Scheuermann's kyphosis (Deposition Dr. Donald Dietz Record Document 115-4 page 30 lines 5-14), and it appears to be palliative care outside the realm of maintenance and cure.

The injured seaman's right to maintenance and cure is not automatic. As this Honorable Court has acknowledged:

> Upon receiving a demand for maintenance and cure, a shipowner is not required to begin payments immediately, but may undertake a reasonable investigation of the seaman's claim. If the shipowner unreasonably rejects the claim after investigation, when in fact the seaman is due maintenance and cure, the owner becomes liable for maintenance and cure payments in addition to compensatory damages. If, by failing to pay, the shipowner has not only been unreasonable but has also been "callous and recalcitrant, arbitrary and capricious, or willful, callous, and persistent," then the owner may also be liable for punitive damages and attorney's fees. The failure to pay maintenance and cure due an injured seaman is reasonable if a diligent investigation indicates that the seaman's claim is not documented by the submission of medical reports or his claim is not legitimate.[21]

---

(E.D.La.1996) (finding that Plaintiff was entitled to payment of medical expenses by shipowner for treatment procedures, only where evidence showed that contemplated treatments would increase his capabilities and improve his physical condition).

[21] *Snyder v. L&M Botruc Rental, Inc*., 924 F. Supp. 2d 728, 733-734 (E.D. La. 2013) (Hon. N.J. Brown) (internal citations omitted).

204/124.0726

In this case, the evidence clearly shows that L&M has acted in good faith at all times and actively investigated and timely paid Martin's maintenance and cure claim. Martin was evaluated the day after the alleged accident and cleared to return to work. He chose to take six weeks off instead, and during that time he did not seek any additional medical treatment. He returned to work at L&M and worked his regular schedule. He did not report any back pain to his supervisors, nor did he tell them that he could not perform his duties. When Plaintiff voluntarily left employment with L&M, he did so to earn more money. Martin underwent a physical in order to be hired by his next employer, Central Gulf, and passed a physical worked from March, 2016 to August, 2016. Plaintiff submitted a health insurance application certifying that he had no back pain. Plaintiff did not report to the Central Gulf any back pain or that he could not perform tasks. He injured his ankle, sought medical treatment for the ankle and missed a few days from work.

L&M's first notice of Martin's allegations and demand for maintenance and cure was the Complaint filed on September 15, 2016. Under the law, L&M was not required to begin payments immediately.[22] A shipowner, such as L&M, may undertake a reasonable investigation of the seaman's claim.[23] When an employer receives a claim for maintenance and cure, it is entitled to investigate and require corroboration of the claim before making payments.[24] In *Smith*, the Honorable Mary Ann Vial Lemmon denied Cross Motions for Partial Summary Judgment on the issue of whether Plaintiff was entitled to maintenance and cure where there was a conflict in opinions on whether Plaintiff's knee surgery was related to an accident between the Plaintiff's

---

[22] *See Morales v. Garijak, Inc*., 829 F.2d 1355, 1358 (5th Cir. 1987), abrogated on other grounds by *Guevara v. Maritime Overseas Corp*., 59 F.3d 1496 (5th Cir. 1995); *McWilliams v. Texaco, Inc*., 781 F.2d 514, 518-20 (5th Cir.1986).

[23] *Id*.

[24] Smith v. Florida Marine Transporters, Inc. 2011 WL 2580625, (USDC LA 6/29/11) page 2 citing *MNM Boats, Inc., v. Johnson,* 248 F.3d 1139 (5th Cir.2001), (citing *Morals, id.*), and *Chaney*, id. page 4 citing *Brown v. Parker Drilling Offshore Corp.,* 410 F.3d 166, 171 (5th Cir.2005) (citing *Morals, id.*)

17

doctor and the company doctor, but granted the defendant's Motion for Summary Judgment dismissing with prejudice the punitive damage claims. There is ample evidence L&M has acted appropriately and reasonable in the handing of the maintenance and cure claim. Under the circumstances, Martin cannot meet this burden of showing arbitrary and capricious handing of the maintenance and cure. All maintenance has been paid to Martin to date, and all "cure" has been paid as submitted for the low back treatment.

With regards to Plaintiff's Motion for Expedited Trial on the Issue of Cure asserted in the alternative, L&M does not oppose an expedited trial. But this matter is currently set for Trial on 4/15/19, and at this time, it would be difficult to arrange for all necessary witnesses for an expedited trial before 4/15/19.

## I. CONCLUSION

For the reasons discussed in detail throughout this Memorandum, L&M respectfully requests that this Honorable Court grant its Motion For Partial Summary Judgment and/or Motion To Compel Cure, on the grounds Plaintiff if not entitled to maintenance and cure for thoracic surgery, and there are genuine issues of material facts in dispute regarding whether Plaintiff had an accident, injuries, the extent of alleged injuries, and whether maintenance and cure is owed for the thoracic surgery as a matter of law.

Respectfully submitted,

*/s/ Wm. Ryan Acomb*
WM. RYAN ACOMB (16780)
Porteous, Hainkel & Johnson, L.L.P.
704 Carondelet Street
New Orleans, LA 70130-3774
Telephone: (504) 581-3838

**CERTIFICATE OF SERVICE**

    I do hereby certify that I have served a copy of the above and foregoing pleading on all counsel of record by filing through the CM/ECF system, which emailed copies of all filed documents to all counsel of record on November 27, 2019.

                                          */s/ Wm. Ryan Acomb*
                                          WM. RYAN ACOMB

19
204/124.0726